**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| MYRON D. SPROWLS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 11-0698 |
| vs. | ) | Judge Nora Barry Fischer |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

## I.  INTRODUCTION

Myron David Sprowls, Jr. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),
seeking review of the final determination of the Commissioner of Social Security ("Defendant"
or "Commissioner") denying his application for a period of disability and disability insurance
benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-434 ("Act").  The
record has been developed at the administrative level.  For the following reasons, the Court finds
that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial
evidence.  Therefore, the Commissioner's Motion for Summary Judgment (Docket No. 15) is
DENIED and the Plaintiff's Motion for Summary Judgment (Docket No. 13) is GRANTED
insofar as it seeks a vacation of the administrative decision under review and REMANDED for
further consideration by the ALJ.

## II.  PROCEDURAL HISTORY

Plaintiff filed an application for DIB on May 27, 2008, claiming disability as of May 27,
2008.  (R. at 10).  The claim was initially denied on September 2, 2008.  (*Id.*).  Plaintiff appeared

and testified at a hearing held on March 26, 2010 in Pittsburgh, Pennsylvania.  (*Id.*).  A

vocational expert also testified.  (*Id.*).  The Administrative Law Judge ("ALJ") issued a decision

denying benefits to Plaintiff on April 22, 2010.  (R. at 10-18).  Plaintiff filed a request for review

of the ALJ's decision by the Appeals Council, which request was denied on April 12, 2011,

thereby making the decision of the ALJ the final decision of the Commissioner.  (R. at 1).

Plaintiff filed his Complaint in this Court on June 3, 2011, and Defendant filed his

Answer on December 28, 2011.  (Docket Nos. 4, 10).  Plaintiff subsequently filed his Motion for

Summary Judgment and Brief in Support on January 24, 2012.  (Docket Nos. 13-14).  Likewise,

Defendant filed his Motion for Summary Judgment and Brief in Support on February 14, 2012.

(Docket Nos. 15-16).  As such, the Motions are now ripe for disposition.

### III.FACTS

#### A.  General Background

Plaintiff was born on May 21, 1960 and lives alone.  (R. at 22).  He is not married and

has no children.  (R. at 66, 168).  His step-brother lives nearby, but his sister and parents have

passed away.  (R. at 29).

Plaintiff has a two-year Associate Degree from Triangle Tech, where he studied heating

and cooling.  (R. at 22).  He attended truck driving school and was employed as a truck driver

from 1993-2007.  (R. at 22, 89).  As a truck driver, he transported general merchandise, freight,

food stuffs, and clothing.  (R. at 23).  Prior to 2007, Plaintiff also worked as a delivery driver and

assistant manager at a pizza parlor, a gas station cashier, a machine operator, and as a security

guard in a steel mill.  (R. at 23, 89).  However, in 2007, his father began to have health troubles,

so Plaintiff quit work to care for him.  (R. at 23).  Since then, he has worked part-time at

Armando's Pizza as a delivery driver and shop cleaner.  (R. at 25-26).

In his own self-report, Plaintiff claimed that he was unable to work based on his bipolar

disorder,[1] arthritis, cataracts, carpal tunnel syndrome,[2] plantar fasciitis,[3] and issues related to his

gallbladder and colon.  (R. at 82).  He alleged these conditions affect lifting, squatting, bending,

standing, reaching, sitting, kneeling, stair climbing, seeing, memory, completing tasks,

concentration, understanding, following instructions, using his hands, and getting along with

others.  (R. at 105).  He had some difficulties with personal care.  (R. at 101).  Plaintiff prepared

food daily and would sometimes eat out.  (R. at 102).  He was able to do household chores as

needed.  (*Id.*).  He would drive his car or walk when going out.  (R. at 103).  He went grocery

shopping, and he paid his bills and handled checking and savings accounts.  (*Id.*).

Most of Plaintiff's day was spent reading the paper, watching television, or listening to

the radio.  (R. at 104).  He noted that it was difficult to concentrate.  (*Id.*).  Socially, he

sometimes spoke with others on the telephone and ate at restaurants.  (*Id.*).  Plaintiff claimed he

did not want anyone to bother him and preferred to be left alone.  (R. at 105).  He described

himself as always being a "loner."  (*Id.*).

Plaintiff further reported that he did not get along well with authority figures, but it is

unclear from the record whether he has ever been fired from a job due to problems getting along

---

[1]     Bipolar disorder is "a condition in which people go back and forth between periods of a very good or
irritable mood and depression. The "mood swings" between mania and depression can be very quick."  PubMed
Health, Bipolar disorder, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001924/ (last visited
January 25, 2012).
[2]     Carpal tunnel syndrome is "the most common nerve entrapment syndrome, characterized by paresthesias,
typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand; often
bilateral and affects women more than men; due to chronic entrapment of the median nerve at the wrist within the
carpal tunnel."  STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).
[3]     Plantar fasciitis is "inflammation of the plantar fascia, most usually non-infectious, and often caused by an
overuse mechanism; elicits foot and heal pain."  STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

with others.[4]  (R. at 106).  Regardless, he claimed that he cannot handle stress "at all" and "hate[s]" any change.  (*Id.*).

## B.  Medical History

Plaintiff's past medical history includes bipolar disorder, depression, diverticulosis,[5] hypertension,[6] obesity and "CP."[7]  (R. at 199, 201-02, 204).  As of April 6, 2010, Plaintiff's medications included Geodon,[8] Celexa[9] and Lisinopril.[10]

### i.  Psychiatric history

Plaintiff received in-patient psychiatric care in 1979 and 1983 for bipolar disorder and schizoaffective disorder,[11] respectively, and his last hospitalization for psychiatric treatment

---

[4]      In his Disability Report, Plaintiff responded "yes" to the question "Have you ever been fired or laid off from a job because of problems getting along with other people?"  (R. at 106).  However, Plaintiff explained: "[N]ot really, but have been fired.  But, usually I just quit because I dont [sic] want the hassel [sic]."  (*Id.*).

[5]      Diverticulitis refers to "small, bulging sacs or pouches of the inner lining of the intestine (diverticulosis) that become inflamed or infected. Most often, these pouches are in the large intestine (colon)."  PubMed Health, Diverticulitis, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001303/ (last visited Jan. 25, 2012).

[6]      Hypertension refers to "[h]igh blood pressure; transitory or sustained elevation of systemic arterial blood pressure to a level likely to induce cardiovascular damage or other adverse consequences."  STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[7]      While the precise meaning of "CP" is unclear from the record, Plaintiff reported chest pains in 2006.  (*See* R. at 167).

[8]      Geodon (Ziprasidone) is "used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). It is also used to treat episodes of mania (frenzied, abnormally excited or irritated mood) or mixed episodes (symptoms of mania and depression that happen together) in patients with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Ziprasidone is in a class of medications called atypical antipsychotics. It works by changing the activity of certain natural substances in the brain."  PubMed Health, Ziprasidone, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001070/ (last visited Jan. 20, 2012).

[9]      Celexa (Citalopram) is "used to treat depression. Citalopram is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs). It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance."  PubMed Health, Citalopram, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (last visited Jan. 20, 2012).

[10]      Lisinopril is "used alone or in combination with other medications to treat high blood pressure. It is used in combination with other medications to treat heart failure. Lisinopril is also used to improve survival after a heart attack. Lisinopril is in a class of medications called angiotensin-converting enzyme (ACE) inhibitors. It works by decreasing certain chemicals that tighten the blood vessels, so blood flows more smoothly and the heart can pump blood more efficiently."  PubMed Health, Lisinopril, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000917/ (last visited Jan. 20, 2012).

[11]      Schizoaffective disorder is a "mental condition that causes both a loss of contact with reality (psychosis) and mood problems."  PubMed Health, Schizoaffective disorder, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001927/ (last visited Jan. 24, 2012).

occurred in 1984.  (R. at 154).  Though Plaintiff took Lithium[12] through 1987, the record reflects

that he only sought psychiatric treatment again at Southwestern Pennsylvania Human Services

Behavioral Health ("SPHS") on June 23, 2008, after filing his disability claim.  (R. at 150-58,

163).  The initial assessment performed by SPHS staff indicated that he sought treatment for

anxiety, confusion, and depression, as he had recently experienced depression, irritability,

agitation, sleep disturbance, weight loss, anhedonia,[13] crying spells, low self-esteem, racing

thoughts, risk-taking behavior, persecutory thoughts, auditory hallucinations, self-condemnatory

thoughts and mood swings.  (R. at 150-52, 158).  He denied any suicidal or homicidal intent.  (R.

at 151).  Plaintiff reported that, at age six, a teenage boy forced oral sex on him in a city park.

(R. at 153).  He remarked that he drank alcohol daily or on weekends, particularly when he was

stressed, and admitted to smoking marijuana two months prior.  (R. at 154).

   During the assessment, Plaintiff's mental status was normal and he was not delusional;

however, he was "suspicious."  (R. at 156).  His Global Assessment of Functioning ("GAF")[14]

was 45.  (R. at 157).  SPHS staff also noted Plaintiff's past hospitalizations.  (R. at 154).

---

[12]      Lithium "is used to treat and prevent episodes of mania (frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Lithium is in a class of medications called antimanic agents. It works by decreasing abnormal activity in the brain."  PubMed Health, Lithium, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000531/ (last visited Jan. 31, 2012).

[13]      Anhedonia is the [a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[14]      The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.  The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed.2000).  An individual with a GAF score of 91–100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81–90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71–80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61–70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51–60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41–50 may have "[s]erious symptoms (e.g., suicidal ideation ... )" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31–40 may have "[s]ome impairment in reality testing or

On August 2, 2008, Ravi Kolli, M.D., conducted a psychiatric evaluation of Plaintiff at

SPHS.  (R. at 163-65).  Plaintiff explained his diagnosis of bipolar disorder in 1979 after

suffering a nervous breakdown and how he subsequently took Lithium for eight years.  (R. at

163).  Plaintiff did not take any other medication until April 2008 when Dr. Mannheimer

allegedly prescribed Seroquel.[15]  (*Id.*).  However, Seroquel caused his blood pressure to drop so

he discontinued its use.  (*Id.*).

At the evaluation, Plaintiff reported a great deal of stress due to his stepfather's dementia

and sister's drug addiction, as well as the fact that he had been unable to work since January

2007 and had no insurance for medical assistance.  (*Id.*).  He claimed his emotional problems as

well as cataracts affected his ability to work as a truck driver. (*Id.*).  Plaintiff further described

his frequent mood swings, which made him agitated, happy, depressed, energetic, or even

reckless.  (*Id.*).  He denied any active suicidal ideations but admitted to passive death wishes in

the past.  (*Id.*).  He also experienced paranoia and heard voices when he did not sleep.  (*Id.*).

Plaintiff denied using drugs or alcohol of late.  (R. at 163-64).

Dr. Kolli noted that Plaintiff was cooperative but excessively talkative.  (R. at 165).  He

spoke with "loose associations" and "rambling speech" and demonstrated a tangential thought

---

communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking
or mood;" of 21–30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in
communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas;" of 11–20
may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or
"gross impairment in communication;" of 1–10 may have "[p]ersistent danger of severely hurting self or others" or
"persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death."
*Id.*

[15]     Seroquel (Quetiapine) tablets and extended-release (long-acting) tablets are used to treat the symptoms of
schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or
inappropriate emotions). Quetiapine tablets and extended-release tablets are also used alone or with other
medications to treat or prevent episodes of mania (frenzied, abnormally excited or irritated mood) or depression in
patients with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of
mania, and other abnormal moods).  PubMed Health, Quetapine, *available at*
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/ (last visited Jan. 29, 2012).  The administrative record
shows that Plaintiff visited Dr. Mannheimer on May 19, 2008, and the record of that visit indicates that Plaintiff was
already taking 50mg of Seroquel.  (R. at 142).  Further, Dr. Mannheimer only evaluated Plaintiff once.  (*Id.*).

process.  (*Id.*).  Though Dr. Kolli reported that Plaintiff was irritable at times, had racing thoughts, suffered from paranoia and had passive death wishes, he still found that Plaintiff's "judgement [sic] can be good."  (*Id.*)

Dr. Kolli diagnosed Plaintiff with bipolar disorder (mixed type) and hypertension.  (*Id.*). He remarked that Plaintiff's psychosocial stressors were "moderate to severe" due to having no job or insurance.  (*Id.*).  His GAF was "about 50."  (*Id.*).  Stating that Plaintiff was clearly in need of medication for his bipolar disorder, Dr. Kolli encouraged him to try Geodon and gave him samples of the same.  (*Id.*).

Plaintiff also began taking Celexa in 2008 and presented to Dr. Kolli several times in 2009 for consultation and medication management.  (R. at 217, 227-31).  Dr. Kolli's progress notes from January 17, 2009 through October 24, 2009 generally show that Plaintiff continued taking Celexa and Geodon and that he was less anxious, paranoid, and depressed.  (*See* R. at 227-31).  On May 16, 2009, Plaintiff reported that he had surgery on one eye and was anticipating surgery on the other so he could return to work.  (R. at 229).  By August 22, 2009, Plaintiff was truck driving again.  (R. at 228).  The October 24, 2009 progress note indicated that Plaintiff's "mood [was] clearly stable."  (R. at 227).  Plaintiff did not report any symptoms of mania or depression but admitted to some anxiety.  (*Id.*).  His GAF was 65.  (*Id.*).

Despite these results, Dr. Kolli completed a mental status questionnaire on February 2, 2010, reporting that Plaintiff would be unable to work eight hours per day on a daily basis and would miss four to seven days of work per month due to his symptoms.  (R. at 234).  He acknowledged Plaintiff suffered from bipolar disorder, and most recently, depression with psychotic features.  (R. at 232).  He explained that his symptoms included agitation and anxiety, depression, racing thoughts, paranoia, mood swings (including elevated moods at times and

elevated energy levels) and reckless behavior during manic episodes.  (*Id.*).  Dr. Kolli's

prognosis was guarded, all the while recognizing that antipsychotic medication, mood stabilizers

and antidepressants, in combination, had decreased Plaintiff's symptoms.  (*Id.*).  He noted that

Plaintiff continued to require medication adjustment.  (*Id.*).  He further explained that Plaintiff

continued to have high levels of anxiety and would require life-long treatment through

medication and counseling "to prevent more severe and frequent mood episodes."  (*Id.*).

###           ii.      *Psychiatric evaluations*

Jack Mannheimer, M.D., performed a psychiatric evaluation of Plaintiff on May 19,

2008, and he submitted a report of said visit, dated June 30, 2008, to the Bureau of Disability

Determination.  (*See* R. 141-48).  The report noted that, while Plaintiff's mood was "irritable"

and his affective expression "intense," his stream and content of thought were organized and

logical, his memory and judgment were intact, and his insight was good.  (R. at 143-44).  From

Dr. Mannheimer's perspective, Plaintiff would be capable of managing benefits on his own

behalf, and Plaintiff did not demonstrate difficulties performing daily activities on a sustained

basis.  (R. at 144).  However, he found that Plaintiff did demonstrate limitations in his ability to

interact with family, friends, neighbors, co-workers, employers or the general public

appropriately and/or effectively based on the fact that Plaintiff had "poor interpersonal

interactions" and reported holding numerous past jobs.  (R. at 144-45).  Dr. Mannheimer noted

marked restrictions in his ability to interact appropriately with the public and with supervisors

and to respond appropriately to work pressures in a usual work setting.  (R. at 147).  He also

found Plaintiff moderately restricted in his ability to interact appropriately with co-workers and

in his ability to respond appropriately to changes in a routine work setting.  (*Id.*).  At the same

time, his ability to understand, remember, and carry out instructions was not affected by his impairment. (*Id.*).

Edward Jonas, Ph.D., conducted a mental residual functional capacity assessment and a Psychiatric Review Technique Form SSA-2506-BK regarding Plaintiff on August 11, 2008. (R. at 177-93). In his evaluation, Dr. Jonas found that Plaintiff indeed suffered from bipolar disorder. (R. at 184). However, he found Plaintiff was not significantly limited in his understanding and memory. (R. at 177). Generally, he was also not significantly limited in terms of sustained concentration and persistence, but he was moderately limited in his ability to work in coordination with, or proximity to, others without being distracted by them. (*Id.*). With regard to his social interaction, Plaintiff was markedly limited in terms of his ability to interact appropriately with the general public. (R. at 178). He was moderately limited both in his ability to accept instructions and respond appropriately to criticism from supervisors and in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). Similarly, Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and in his ability to set realistic goals or make plans independently of others. (*Id.*).

After review of the medical records and findings of Dr. Mannheimer, Dr. Jonas opined that Plaintiff was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." (R. at 179). The assessment claimed to partially reflect the opinion of Dr. Mannheimer, whose statements concerning Plaintiff "are fairly consistent with the other evidence in file." (*Id.*). Therefore, Dr. Mannheimer's report was given "appropriate weight" and found to be "partially consistent" with the assessment. (*Id.*).

### iii.     Physical history

For issues relating to his eyesight, Plaintiff presented to Dr. Gipson on August 6, 2007 and on February 18, 2008. (R. at 159-60). During the first visit, he complained of blurred vision, and Dr. Gipson discovered mild cataracts in both eyes. (R. at 159). Dr. Gipson told Plaintiff that cataract surgery was not needed at that point and that he should follow-up in seven months. (*Id.*). When Plaintiff returned on February 18, 2008, he reported particular blurriness in his left eye and difficulty seeing road signs and seeing close-up. (R. at 160). Both cataracts were still mild. (*Id.*). Dr. Gipson recommended that Plaintiff return in six months, unless his vision became significantly worse such that he wanted or needed cataract surgery. (*Id.*).

On April 2, 2009, Plaintiff sought treatment from Dr. Holets, complaining of right hand numbness, particularly in the morning, in the palm side of the right hand. (R. at 204). Dr. Holets diagnosed Plaintiff as having an ulnar nerve lesion and prescribed an elbow brace as treatment. (R. at 205). Dr. Holets also noted that Plaintiff's hypertension was associated with obesity but had improved eighty to ninety percent due to his medical regimen. (*Id.*). He further described Plaintiff's bipolar affective disorder as "mild." (*Id.*).

Plaintiff returned to Dr. Holets on April 20, 2009 for a check-up prior to cataract surgery the following week. (R. at 202, 211). He again complained of diminished vision, particularly in his left eye. (R. at 202). His hand pain was unchanged since the last visit, so Dr. Holets started Plaintiff on a prescription for Medrol[16] and Mobic.[17] (R. at 202-03). Plaintiff denied any depression. (R. at 202).

---

[16]     Medrol (Methylprednisolone Oral), "a corticosteroid, is similar to a natural hormone produced by your adrenal glands. It is often used to replace this chemical when your body does not make enough of it. It relieves inflammation (swelling, heat, redness, and pain) and is used to treat certain forms of arthritis; skin, blood, kidney, eye, thyroid, and intestinal disorders (e.g., colitis); severe allergies; and asthma. Methylprednisolone is also used to treat certain types of cancer." PubMed Health, Methylprednisolone Oral, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000776/ (last visited Jan. 30, 2012).

Plaintiff followed-up with Dr. Holets on June 19, 2009 regarding his right hand pain.  (R. at 201).  He told Dr. Holets that he thought the numbness was seventy-five percent better but still present – mostly in the "pinky" finger.  (*Id.*).  Dr. Holets found no swelling, and Plaintiff exhibited "satisfactory" strength in the hand as well as "intact" sensation.  (*Id.*).  Dr. Holets noted Plaintiff's left eye cataract surgery in April 2009 and right eye cataract surgery in May 2009.  (*Id.*).  He also instructed Plaintiff to continue taking Mobic.  (*Id.*).

Plaintiff again presented to Dr. Holets on January 8, 2010 for suture removal after falling on ice, at which time Dr. Holets instructed Plaintiff to continue his medications for bipolar disorder, depression, hypertension, and the hand pain relating to his ulnar nerve.  (R. at 199).

### iv.    *Physical evaluations*

Dr. Holets performed a physical consultative examination of Plaintiff on behalf of the Bureau of Disability Determination on August 5, 2008.  (R. at 166-69).  During the assessment, Plaintiff discussed his history of bipolar disorder, including treatment.  (R. at 166).  He complained of arthritic pain while walking, as well as the fact that he had to quit his last job as a truck driver one and a half years earlier due to his cataracts.  (R. at 166-67).  When questioned about his gallbladder, Plaintiff reported chest pains two years prior.  (R. at 167).  A subsequent CT scan showed Plaintiff to have cholelithiasis,[18] which is asymptomatic.  (*Id.*).

---

[17]    Mobic (Meloxicam) is "used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints). Meloxicam is also used to relieve the pain, tenderness, swelling, and stiffness caused by juvenile rheumatoid arthritis (a type of arthritis that affects children) in children 2 years of age and older. Meloxicam is in a class of medications called nonsteroidal anti-inflammatory drugs (NSAIDs). It works by stopping the body's production of a substance that causes pain, fever, and inflammation."  PubMed Health, Meloxicam, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000173/ (last visited Jan. 30, 2012).

[18]    Cholelithiasis refers to the "[p]resence of concretions in the gallbladder or bile ducts."  STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

Plaintiff stated he was doing "fairly well." (*Id.*).  He had no recent weight loss or gain, though he was obese at 67 inches tall and 235 pounds.  (R. at 167-68).  He mentioned his hypertension and admitted to using a lot of salt.  (R. at 167).  Dr. Holets noted Plaintiff's history of asymptomatic gallstones and that he was due for a colonoscopy, which he had not yet had due to his lack of insurance.  (*Id.*).  Plaintiff underwent outpatient carpal tunnel surgery in 1993, and "occasionally complains of some tingling in his left hand." (*Id.*).  With regard to Plaintiff's 2006 chest pain, a subsequent stress test was negative.  (*Id.*).

Dr. Holets found Plaintiff to be awake, alert, and oriented.  (R. at 168).  Plaintiff exhibited normal gait and he was able to walk "with ease on his toes and on his heels." (*Id.*).  He remarked that Plaintiff could lift and carry twenty-five pounds "easily" and that standing, walking, sitting, pushing and pulling would be unlimited.  (R. at 169).  Further, he had no restrictions on postural activities or other physical function or environmental restrictions.  (*Id.*).

In a physical residual functional capacity assessment completed by state agency evaluator, Darren Gallaher, on August 11, 2008, Plaintiff's primary diagnosis was obesity, and his secondary diagnosis was cataracts.  (R. at 170).  Plaintiff exhibited some exertional limitations, but not any postural, manipulative, visual, communicative or environmental limitations.  (R. at 171-73).  Gallaher found Plaintiff to have provided inconsistent information regarding his daily activities.  (R. at 175).  While Plaintiff "alleged performing few, if any, household chores . . . the overall evidence suggests that he has the ability to care for himself and maintain his home." (*Id.*).  Furthermore, Gallaher explained that "he is able to drive a car" and "the treatment for his impairments has been essentially routine and conservative in nature." (*Id.*).  Although the field office personnel observed him having difficulty with his sight while at the field office, they did not observe other difficulties.  (*Id.*).  Accordingly, Gallaher gave great

weight to the August 5, 2008 report by Dr. Holets, which stated that Plaintiff is not limited in standing, walking, sitting, or pushing and pulling.  (R. at 176).

### C.  Administrative Hearing

#### i.  *Plaintiff's Testimony*

A hearing regarding Plaintiff's application for DIB was held on March 26, 2010 in Pittsburgh, Pennsylvania before ALJ James Bukes.  (R. at 19).  At this hearing, Plaintiff appeared with the assistance of counsel, Lindsay Brown, Esquire.  (*Id.*).  Ms. Copar,[19] an impartial vocational expert, also appeared to testify.  (*Id.*).

Plaintiff initially testified as to his living situation and work history.  (R. at 22-23).  He then described how he began to re-exhibit symptoms of depression and bipolar disorder in May 2008.  (R. at 24).  In the past, he also had problems with alcohol, though he claimed to have stopped drinking since his treatment for depression and bipolar disorder.  (*Id.*).  He did not consider himself an alcoholic, nor did he attend Alcoholics Anonymous ("AA") meetings.  (R. at 29).  Plaintiff reported that Dr. Kolli prescribed him Geodon and Celexa for his psychological ailments, while Dr. Holets prescribed Lisinopril.  (R. at 24).  Because Celexa and Lisinopril made Plaintiff drowsy, he took those medications in the evening.  (R. at 31).

Plaintiff further testified that, since 2007, he received unemployment benefits for a period of time.  (R. at 25).  When those benefits ceased, he obtained a part-time job at Armando's Pizza.  (*Id.*).  As of the date of the administrative hearing, Plaintiff still worked part-time at Armando's Pizza, approximately six and one-half hours per day.  (R. at 26).  He claimed that, while he only made $1,725 in all of 2009, he had already earned $1,500 in 2010.  (R. at 25).  Accordingly, he

---

[19]     Ms. Copar is a certified vocational expert and has many years of experience as a vocational supervisor and vocational case manager in Pittsburgh, Pennsylvania.  (R. at 59-60).

was earning roughly $600 per month.  (R. at 26).  Plaintiff reported difficulty remembering

orders, getting "lost on deliveries," and delivering food to the wrong individuals.  (R. at 30).

In 2009, Plaintiff obtained insurance coverage for a brief period to undergo surgery to

remove cataracts in both eyes.  (R. at 26-27).  He stated that, at that point, he was almost blind in

one eye.  (R. at 27).  He also mentioned that, in January 2009, he was asked to schedule a follow-

up appointment with his surgeon but he had not done so because his previous coverage had

expired.  (*Id.*).

Plaintiff explained he also had carpal tunnel syndrome in his right wrist and a problem

with the ulnar nerve in his right elbow, which he claimed requires surgery.  (*Id.*).  The nerve

problem resulted in numbness in his right hand, although it had improved in the past eight

months such that he only felt numbness for about half an hour or forty-five minutes in the

morning and "then it sort of goes away."  (R. at 27-28).  Plaintiff testified he weighed roughly

215 pounds. (R. at 28).

Plaintiff also reported receiving psychiatric treatment from Dr. Kolli at SPHS.  (*Id.*).  He

saw Dr. Kolli every two months and Ms. Spindler, a counselor, once a month for "individual

therapy."  (*Id.*).  Due to Plaintiff's low income, he claimed "the county [was] paying" for his

psychiatric treatments and evaluations, though he denied receiving public assistance.  (*Id.*).

Plaintiff testified that, on a typical day, he would wake up in the morning and then

usually eat at a local restaurant.  (R. at 28-29).  Then he would return home and spend "all day

sitting there," watching significant amounts of television.  (R. at 29).  Though he owned a dog

and would take the dog for walks, he stated that he did not have "any hobbies or anything.  I just

– I do watch a lot of [television] though."  (*Id.*).

Plaintiff stated that did not believe he is able to work a full-time job due to his bipolar disorder.  (*Id.*).  He claimed that he was "very nervous all the time" and had "a hard time concentrating on stuff."  (R. at 29-30).  He also said that he had always had a great deal of anxiety.  (R. at 30).  However, while he often woke up during the night, he slept approximately eight hours.  (*Id.*).  He occasionally took naps in the evening.  (*Id.*).  He explained that he did not have general fatigue and was "okay" most days.  (R. at 30-31).

### ii.   *Vocational Expert's Testimony*

Following Plaintiff's testimony, the ALJ asked Ms. Copar to classify Plaintiff's past work experience.  (R. at 31).  Ms. Copar designated a cashier as an unskilled position with a light exertion level and a food deliverer as an unskilled position with a medium exertion level.  (*Id.*).  She stated the security guard position was semi-skilled with a sedentary exertion level as performed, while the truck driver position was semi-skilled with heavy exertion as performed.  (*Id.*).  Then, the ALJ questioned Ms. Copar as to whether work existed for a hypothetical person of Plaintiff's age, education level and work experience.  (R. at 32).  He specifically asked Ms. Copar to assume that the hypothetical person would be limited to medium work, jobs that do not require acute vision or "fine fingering" with the right hand, jobs that avoid work and close coordination with co-workers, and those that avoid intensive supervision and changes in the work setting.  (*Id.*).  Ms. Copar responded that such an individual could perform the food deliverer or security guard position.  (*Id.*).

However, assuming the hypothetical person should also avoid assembly line pace and anything more than simple decision-making, Ms. Copar eliminated the security guard position.  (*Id.*).  Such individual could, however, work as a laundry folder, with over 100,000 positions in the national economy, or as an order caller, with over 500,000 positions nationally.  (R. at 33).

Finally, said individual could work as a sorter, with over 400,000 positions. (*Id.*). Further assuming that the described individual should avoid face-to-face interaction with the general public, Ms. Copar eliminated the order caller position but not the laundry folder or sorter position. (*Id.*). Finally, there would be no jobs in the national economy for an individual with manic episodes that required him or her to take unscheduled breaks throughout the work day. (*Id.*).

### D. ALJ's Decision

The ALJ issued his decision on April 22, 2010 and made the following determinations:

1. Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2012;

2. Plaintiff has not engaged in substantial gainful activity since May 27, 2008, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*);

3. Plaintiff has the following severe impairments: bipolar affective disorder with a history of psychotic features that are not controlled on medication; anxiety disorder; obesity; bilateral mild cataracts; and mild to moderate peripheral neuropathy affecting the right hand (20 CFR 404.1520(c));

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 2 (20 CFR 404.1520(d), 404.1525 and 404.1526);

5. Plaintiff has the residual functional capacity to perform medium work, except that he cannot perform fine manipulative activities with the dominant right hand, cannot do any job that requires acute vision, cannot work in close coordination with coworkers or under intensive supervision, cannot work in a setting where there are frequent or

substantial changes, can make only simple decisions, and cannot work at an assembly

line pace, and cannot work face to face with the general public;

6. Plaintiff is unable to perform past relevant work (20 CFR 404.1565);

7. Plaintiff was born on May 21, 1960 and was 48 years old which is defined as a

younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563);

8. Plaintiff has more than a high school education and is able to communicate in English

(20 CFR 404.1564);

9. Transferability of job skills is not material to the determination of disability because

Plaintiff is limited to unskilled work; and

10. Considering Plaintiff's age, education, work experience, and residual functional

capacity, there are jobs that exist in significant numbers in the national economy that

Plaintiff can perform (20 CFR 404.1560(c) and 404.1566).

Thus, the ALJ found that Plaintiff has not been disabled within the meaning of the Social

Security Act at any time from the date the application was filed through the date of the ALJ

decision.  (R. at 12-18).

The ALJ determined that Plaintiff's bipolar disorder "with a history of psychotic features

that are now controlled on medication," anxiety disorder, obesity, bilateral mild cataracts and

mild to moderate peripheral neuropathy affecting the right hand do limit Plaintiff's ability to

complete basic physical and mental work.  (R. at 12).  However, acknowledging that Plaintiff

also has a history of carpal tunnel syndrome, hypertension, and alcohol abuse that has been in

remission since 2008, the ALJ found that these conditions "have not caused more than a minimal

loss of ability to do basic work activities for any period of twelve months or more since the

alleged onset date of disability." (R. at 12-13). As such, Plaintiff's ailments are not severe medically determinable impairments. (R. at 13).

Further, the ALJ found that Plaintiff has only mild restriction in activities of daily living. (*Id.*). For instance, he works three days a week, driving a pizza delivery car and keeping the shop clean. (*Id.*). He also dines at restaurants, handles his personal affairs independently, and completes his own household chores. (*Id.*). In terms of social functioning, however, he has moderate difficulties. (*Id.*). Although the "more severe signs of mental illness have abated with treatment . . . he still has a degree of anxiety that would keep him from concentrating and persisting at difficul[t] or highly stressful tasks." (*Id.*). Nonetheless, the ALJ explained that the record does not demonstrate any episode of decompensation. (*Id.*).

The ALJ also determined that Plaintiff has the residual functional capacity to perform medium work, "except that he cannot perform fine manipulative activities with the dominant right hand, cannot do any job that requires acute vision, cannot work in close coordination with coworkers or under intensive supervision, cannot work in a setting where there are frequent or substantial changes, can make only simple decisions, and cannot work at an assembly pace, and cannot work face to face with the general public." (R. at 14). Still, the ALJ considered a number of factors, which, on balance, did "not favor a finding that [Plaintiff] cannot do any work at a level consistent with substantial gainful activity." (R. at 15). For example, he has a solid work record, he did not quit his full-time job for medical reasons but rather to care for his father, and he has not required substantial treatment for the numbness in his hand. (*Id.*). Plaintiff does not suffer from a loss of range of motion or of strength, and an electrodiagnostic test showed only mild neuropathy. (*Id.*). Further, Plaintiff "had no deficits of strength or of sensation" with

regard to the numbness in his hand, and his obesity is mild, which would not affect his ability to sit, stand, walk, use his hands or arms, or lift and carry objects.  (*Id.*).

Nonetheless, the ALJ found that Plaintiff is unable to perform any past relevant work, as his former jobs fall within his physical capacity but may exceed his tolerance for social interaction.  (R. at 17).  The ALJ acknowledged Plaintiff's history of anxiety and depression and remarked that he has not received in-patient mental health treatment since 1984.  (R. at 16).  Though he sought mental health services in May 2008, "the symptoms that prompted him to seek treatment have largely been resolved by treatment."  (*Id.*).  Additionally, Plaintiff no longer displays psychotic symptoms and has continued to maintain a GAF of 60 to 65, which is "indicative of only mild to moderate functional impairment."  (*Id.*).

The ALJ found that the opinion evidence submitted by Dr. Kolli in his mental status questionnaire was "inconsistent on its face."  (*Id.*).  Though Dr. Kolli asserted that Plaintiff could not work full time because of his symptoms, he also found that Plaintiff only had mild restrictions in his ability to handle social interaction and to concentrate, persist, and maintain pace at assigned tasks.  (*Id.*).  Further, Dr. Kolli did not mention that Plaintiff "experienced any loss of the ability to perform ordinary activities of daily living," and he noted in his treatment records that Plaintiff was doing well.  (*Id.*).  The ALJ also pointed out that Plaintiff's symptoms of severe mental illness abated soon after Plaintiff began treatment and did not recur for any continuous period of twelve months or more after the alleged onset date.  (*Id.*).  Nonetheless, the ALJ indicated that Dr. Kolli did not fully consider Plaintiff's inability to handle certain social situations and to concentrate on tasks; as such, the ALJ found he was "moderately limited in these areas" in light of Dr. Mannheimer's opinion.  (R. at 16-17).

Since the vocational expert testified that a hypothetical individual in Plaintiff's position could perform as a laundry folder or a sorter, positions which account for more than 500,000 jobs in the national economy, the ALJ determined that Plaintiff "is capable of making a successful adjustment to other work" and is, therefore, not disabled within the meaning of the Social Security Act.  (R. at 18).  This decision is now being challenged by Plaintiff.

## IV. STANDARD OF REVIEW

To be eligible for disability insurance benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).  When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability.  20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas,* 540 U.S. 20, 24–25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).  If the claimant is determined to be unable to resume previous employment, the burden

shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[20] 1383(c)(3)[21]; *Schaudeck v. Comm'r Soc. Sec.,* 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel,* 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.,* 332

---

[20]     Section 405(g) provides in pertinent part: "Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business." 42 U.S.C. § 405(g).

[21]     Section 1383(c)(3) provides in pertinent part: "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

U.S. 194, 196–97 (1947).  The court will not affirm a determination by substituting what it considers to be a proper basis.  *Chenery,* 332 U.S. at 196–97.  Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."  *Monsour Medical Center v. Heckler,* 806 F.2d 1185, 1191 (3d Cir. 1986).

## V.  DISCUSSION

In his Motion for Summary Judgment, Plaintiff claims that the ALJ "erred as a matter of law by failing to give appropriate weight to the opinion of [Plaintiff's] treating psychiatrists, Dr. Kolli and Dr. Mannheimer, that [Plaintiff] was disabled due to his medical impairments." (Docket No. 14 at 4).  He argues that, "[f]aced with two supportive medical treating source statements, the ALJ improperly gives Dr. Kolli's opinion 'little weight,' fails to adequately address the marked limitations assessed by Dr. Mannheim [sic], and denies benefits."  (*Id.* at 5). Further, "[t]he ALJ considers no other opinions – even from non-treating sources – other than his own lay opinion in reaching his strained conclusion."  (*Id.*).  Plaintiff maintains that "[i]f an ALJ accepts a medical opinion, he must include the established limitations in his residual functional capacity ("RFC") finding and [vocational expert] hypothetical.  If the ALJ rejects a medical opinion, then he must give a legally sufficient reason for doing so."  (*Id.* at 8).

Defendant counters that the ALJ appropriately found that Dr. Kolli's assertion that Plaintiff could not work full time and would miss four to seven days per month due to his symptoms was not supported by the medical record.  (Docket No. 16 at 9).  Defendant also asserts that the ALJ did not err in evaluating Dr. Mannheimer's opinion.  (*Id.* at 10).  First, he claims Dr. Mannheimer was not a treating physician in accordance with 20 C.F.R. §§ 404.1502,

404.1527(d)(2).  (*Id.*).  Second, Defendant argues that the ALJ "adequately incorporated into the RFC assessment the limitations . . . assessed by Dr. Mannheimer . . ." (*Id.* at 11).

"Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett v. Commissioner of Social Security,* 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel,* 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a).  An ALJ must consider all relevant evidence when determining an individual's RFC.  *See* 20 C.F.R. § 404.1545(a); *Burnett,* 220 F.3d at 121.  This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others."  *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001).  An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner.  20 C.F.R. § 416.927(e)(2).  The ALJ's finding of residual functional capacity must be "accompanied by a clear and satisfactory explication of the basis on which it rests."  *Fargnoli,* 247 F.3d at 41 (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  In *Cotter*, the United States Court of Appeals for the Third Circuit explained:

> In our view an examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision.  This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence.

*Cotter*, 642 F.2d at 705 (quoting *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974)).

Here, the ALJ found that Plaintiff had the RFC to perform medium work,

> except that he cannot perform fine manipulative activities with the dominant right hand, cannot do any job that requires acute vision, cannot work in close coordination with coworkers or under intensive supervision, cannot work in a setting where there are frequent or substantial changes, can make only simple

decisions, and cannot work at an assembly line pace, and cannot work face to face with the general public.

(R. at 14).  He claimed to have considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as "opinion evidence" in accordance with various federal and Social Security Administration regulations.  (*Id.*).

In analyzing Plaintiff's mental limitations, the ALJ cited Plaintiff's "long history of anxiety and depression" and described his psychiatric treatment since May 2008.  (R. at 16).  He was persuaded by Dr. Kolli's "relatively benign findings on multiple mental status evaluations" and remarked that Plaintiff's "psychotic symptoms are now absent" and that he is "no longer agitated, irritable, or more than moderately anxious."  (*Id.*).  However, the ALJ went on to discredit Dr. Kolli's "inconsistent" view that Plaintiff could not work full time and would miss work four to seven times per month due to his symptoms, noting that Dr. Kolli simultaneously found Plaintiff to be only mildly limited in his ability to handle social interaction and to maintain concentration, persistence, and pace.  (*Id.*).  The ALJ also referred to Dr. Kolli's recent treatment records which stated that Plaintiff had been doing well, that his mood was stable, that he was reacting well to his medications, and that he was no longer experiencing paranoia or auditory hallucinations.  (*Id.*).

Moreover, the ALJ concluded, in light of Dr. Mannheimer's opinion, that Dr. Kolli underestimated the effect of Plaintiff's mental disorder on his ability to handle social interactions and to concentrate on tasks.  (R. at 16-17).  Accordingly, the ALJ determined that Plaintiff was "moderately" limited in those areas and accorded "little weight" to Dr. Kolli's opinion.  (R. at 17).  The ALJ provided no further analysis of Dr. Mannheimer's opinion and failed to mention the opinion of Dr. Jonas, a consultative examiner.

Under the law of the Third Circuit, an ALJ need not accept the medical judgment of a treating physician. *See Jones v. Sullivan*, 954 F.2d 125, 128-29 (3d Cir. 1991) (finding that the opinions offered by Jones' treating physicians were conclusory and unsupported by the medical evidence and that the ALJ correctly determined that their opinions were not controlling). Here, based on *Jones*, the ALJ was not required to adopt Dr. Kolli's opinion. However, a physician's occasional "notation that a condition is 'stable and well controlled with medication' during treatment does not necessarily support the conclusion that the patient is able to work. . . . These types of inconsistencies do not per se create an inconsistent medical record." *Metz v. Astrue*, 2010 WL 3719075, at * 13 (W.D. Pa. Sept. 17, 2010) (quoting *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)).

Nonetheless, in reaching his finding that Plaintiff is not disabled, the ALJ does not mention the contradictory findings of Dr. Mannheimer and Dr. Jonas, nor does he assess their credibility or the weight given to their treatment notes and/or opinions. *See Fargnoli*, 247 F.3d at 43. In *Cotter*, the Court held that "[t]he ALJ has a duty to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits." *Cotter*, 642 F.2d at 704. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43. He must make enough factual findings so that the reviewing court has the ability to determine if "significant probative evidence was not credited or simply ignored." *Id.* at 42. In *Burnett*, the Court determined that the ALJ had not properly fulfilled his duty where he failed to "consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." *Burnett*, 220 F.3d at 121. The Court "remanded the case to the ALJ with instructions 'to review all of the pertinent medical

evidence, explaining any conciliations and rejections." *Fargnoli*, 247 F.3d at 43 (quoting *Burnett*, 220 F.3d at 122).

In the instant matter, the ALJ made passing reference to Dr. Mannheimer's psychiatric evaluation but did not address his other findings.  (*See* R. at 16-17).  Though Defendant argues that Dr. Mannheimer was not a treating physician and his opinion could not be given controlling weight, ". . . the report of no physician, whether the claimant's or the Secretary's, should be treated as totally dispositive or incompetent."  *Williams v. Sullivan*, 970 F.2d 1178, 1185 n.5 (3d Cir. 1992).  As such, Dr. Mannheimer's status as either a treating physician or a non-treating source in accordance with 20 C.F.R. § 404.1502 does not bear on whether his opinion merited proper evaluation by the ALJ.

Dr. Mannheimer found that Plaintiff demonstrated limitations in his ability to interact with family, friends, neighbors, co-workers, employers or the general public appropriately and/or effectively based on the fact that Plaintiff had "poor interpersonal interactions" and reported holding numerous past jobs. (R. at 144-45).  Significantly, he noted marked restrictions in Plaintiff's ability to interact appropriately with the public and with supervisors and to respond appropriately to work pressures in a usual work setting.  (R. at 147).  Contrary to Defendant's assertion, the ALJ did not incorporate Plaintiff's marked limitation in his ability to respond appropriately to work pressures in a usual work setting into his RFC assessment.  Moreover, the ALJ did not even reference Dr. Jonas' mental RFC assessment throughout his decision, which concluded that Plaintiff had a marked limitation in his ability to interact appropriately with the public.  (R. at 178).

The ALJ's lack of analysis of these findings leaves this Court wondering if "he considered and rejected them, considered and discounted them, or failed to consider them at all."

*Fargnoli*, 247 F.3d at 43-44. Thus, his "failure to explain his implicit rejection of this evidence or even to acknowledge its presence was error." *Id.* (quoting *Cotter*, 642 F.2d at 707). The Court therefore cannot conclude that his findings at step four were supported by substantial evidence.

In light of the foregoing discussion, the ALJ's decision cannot be affirmed and the Court need not address the parties' alternative arguments. The only remaining question is "whether a judicially-ordered award of benefits is proper, or whether the case should be remanded to the Commissioner for further administrative proceedings." *Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D. Pa. 2010). "An immediate award of benefits is appropriate only when the evidentiary record has been fully developed, and when the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled." *Id.* (citing *Morales*, 225 F.3d at 320).

This standard is not met here. The record reflects that Plaintiff, since the onset of his disability, worked a part-time job delivering pizza. (R. at 25-26). Work that an individual seeking disability benefits has completed since the onset of disability may show that he or she is able to engage in work at the substantial gainful activity level. 20 CFR § 404.1571. Even though the ALJ found that Plaintiff's part-time work was not substantially gainful activity, it may indicate that Plaintiff is able to work more than he actually does. *Id.* In addition, the potentially inconsistent opinion of Dr. Kolli must be evaluated against and reconciled with the opinions of Drs. Mannheimer and Jonas.

For these reasons, further development of the record is needed.

## VI. CONCLUSION

Based on the foregoing, the decision of the ALJ is not adequately supported by substantial evidence from Plaintiff's record within the meaning of 42 U.S.C. § 405(g). Accordingly, Defendant's Motion for Summary Judgment is DENIED.  Plaintiff's Motion for Summary Judgment is GRANTED to the extent that he seeks a vacation of the administrative decision under review, and the case is REMANDED for further proceedings.[22]  An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf:  All counsel of record.

Date:   March 12  , 2012

---

[22]      The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion.  *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800-01 (3d Cir. 2010).  He must consider and make specific findings regarding all of the relevant medical evidence and weigh that evidence.  *See Fargnoli*, 247 F.3d at 44.  To the extent that the ALJ reaches a contradictory finding to that of Plaintiff's treating and consultative examiners, "he must explain the reasoning behind such a finding, including reconciling conflicts and discussing how and why probative evidence supporting Plaintiff's claim was discounted and/or rejected."  *Id.*